## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE REED,<br><br>               Plaintiff,<br><br>    v.<br><br>TALLGRASS ENERGY, LP, DAVID DEHAEMERS, WILLIAM R. MOLER, MARCELINO OREJA ARBURUA, GUY G. BUCKLEY, ROY N. COOK, THOMAS A. GERKE, WALLACE C. HENDERSON, MATTHEW J.K. RUNKLE, and TERRANCE D. TOWNER,<br><br>               Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Lawrence Reed, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against Tallgrass Energy, L.P. ("TGE" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with TGE, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of TGE by Prairie Private Acquiror LP ("Buyer") and Prairie Merger Sub LLC ("Buyer Sub"), which are affiliates of the Sponsors and the Blackstone Parties, all of which have BIP Holdings Manager

L.L.C., already a controlling shareholder of TGE, as their sole general partner ("BIP Holdings" and together with Buyer and Buyer Sub, "Blackstone").

2.      On December 17, 2019, TGE announced that they had entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which TGE would merge with and into Blackstone (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, TGE's shareholders will be entitled to receive $22.45 per share in cash (the "Merger Consideration").

4.      On January 21, 2020, in order to convince TGE's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by TGE's financial advisors, Evercore Group L.L.C. ("Evercore" or the "Financial Advisors") regarding the Proposed Transaction.

6.      The Proposed Transaction is expected to close in the second quarter of 2020 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to TGE's public common shareholders

sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, TGE's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of TGE common stock.

12.     Defendant TGE is a Delaware limited partnership with its principal executive offices located at 4200 West 115th Street, Suite 350, Leawood, Kansas 66211.

13.     Defendant David Dehaemers ("Dehaemers") was the Company's Chief Executive Officer ("CEO") through the calendar year 2019.

14.     Defendant William R. Moler ("Moler") is the Company's CEO and is, and has been at all relevant times, a director of the Company.

15.     Defendant Marcelino Oreja Arburua ("Arburua") is, and has been since March 2019, a director of the Company.

16.     Defendant Guy G. Buckley ("Buckley") is, and has been since March 2019, a director of the Company.

17.     Defendant Roy N. Cook ("Cook") is, and has been at all relevant times, a director of the Company.

18.     Defendant Thomas A. Gerke ("Gerke") is, and has been at all relevant times, a director of the Company.

19.     Defendant Wallace C. Henderson ("Henderson") is, and has been since March 2019, a director of the Company.

20.     Defendant Matthew J.K. Runkle ("Runkle") is, and has been since March 2019, relevant times, a director of the Company.

21.     Defendant Terrance D. Towner ("Towner") is, and has been at all relevant times, a director of the Company.

22.     The Defendants identified in paragraphs 13 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

23.     TGE is a publicly traded Delaware limited partnership that owns, operates, acquires, and develops midstream energy assets in North America.  Its operations are conducted through, and its operating assets are owned by, its direct and indirect subsidiaries, and TGE is located in and provides services to certain key United States hydrocarbon basins, including the Denver-Julesburg, Powder River, Wind River, Permian and Hugoton-Anadarko Basins, and the Niobrara, Mississippi Lime, Eagle Ford, Bakken, Marcellus, and Utica shale formations.

24.     TGE's three reportable business segments are Natural Gas Transportation, Crude Oil Transportation, and Gathering, Processing & Terminalling, with TGE's primary assets consisting of: natural gas transportation and storage assets, natural gas gathering and processing assets, crude oil storage and terminalling assets, and water business service assets.

25.     Prior to the announcement of the Proposed Transaction, TGE had excellent prospects.

26.     Indeed, on August 27, 2019, TGE publicly announced that Blackstone had made an unsolicited offer to acquire TGE for $19.50 per share in cash.

27.     Although the trading price of TGE's stock declined from $23.90 to $14.35 between May 28, 2019 through August 27, 2019, Dehaemers, then still TGE's CEO later blamed that decline on the buying and selling patterns of TGE's "largest institutional holders" rather than any decline in the intrinsic value of TGE stock during that period.

28.     Thus, the Proposed Transaction comes at a time when TGE's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" TGE's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

29.     Despite TGE's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out TGE's stockholders and deprives them the ability to partake in

TGE's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

30.   On December 17, 2019, TGE issued a press release announcing the Proposed Transaction:

TALLGRASS ENERGY ANNOUNCES AGREEMENT FOR THE PURCHASE OF ITS PUBLICLY-HELD CLASS A SHARES BY BLACKSTONE INFRASTRUCTURE PARTNERS

December 17, 2019 12:58 AM Eastern Standard Time

LEAWOOD, KAN.--(BUSINESS WIRE)—Tallgrass Energy, LP (NYSE: TGE today announced that it has entered into a definitive merger agreement pursuant to which affiliates of Blackstone Infrastructure Partners together with affiliates of Enagas, GIC, NPS and USS (collectively with Blackstone Infrastructure Partners, the "Sponsors") will acquire all of the publicly-held outstanding Class A Shares of TGE for $22.45 in cash per Class A Share.

The transaction is expected to close in the second quarter of 2020, subject to the satisfaction of customary conditions, including approval of the merger by holders of a majority of the outstanding Class A and Class B Shares of TGE, voting together as a single class, inclusive of the approximately 44 percent of the total Class A and Class B Shares held by the Sponsors. Upon closing of the transaction, the Class A Shares will cease to be publicly traded. Pursuant to the merger agreement, TGE has agreed not to pay distributions during the pendency of the transactions contemplated by the merger agreement.

The Conflicts Committee of the Board of Directors of Tallgrass Energy GP, LLC, TGE's General Partner ("TGE GP"), after consultation with its independent legal and financial advisors, unanimously approved the transaction and determined it to be in the best interests of TGE and its public shareholders.

The Sponsors expect to fund the purchase of the Class A Shares with approximately $3 billion of equity, with the remainder of the funding necessary to consummate the transaction provided by debt.

Citigroup Global Markets Inc. and Credit Suisse Securities (USA) LLC served as financial advisors and Vinson & Elkins L.L.P. acted as legal advisor to Blackstone Infrastructure Partners. Latham & Watkins LLP acted as legal advisor to Enagas. Sidley Austin LLP acted as legal advisor to GIC.

Evercore Group LLC served as the financial advisor and Bracewell LLP acted as legal advisor to the Conflicts Committee of the Board of Directors of TGE's General Partner.

Baker Botts L.L.P. acted as legal advisor to TGE.

**The Preclusive Deal Protection Devices**

31.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

32.     The Merger Agreement is protected by "no-shop" provisions that prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

33.     These no-shop provisions also require the Board to provide Blackstone with written notice of any Alternative Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Alternative Proposal and negotiate with Blackstone following Blackstone's receipt of the notice, so that Blackstone has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

34.     In addition, the Merger Agreement provides that the Company will be required to pay to Blackstone a termination fee of $70,000,000.00 with respect to any termination under the no-shop provision.

35.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

36.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

37.     On or about January 21, 2020, in order to convince TGE's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

38.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

   A.     **The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

39.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

40.     The Proxy fails to disclose whether any potential counterparties to a strategic transaction with TGE are presently subject to standstill obligations and, if so, how many.  Page B-5 of the Proxy states that the Individual Defendants have agreed not to "amend, terminate, waive or fail to enforce, or grant any consent under, any confidentiality, standstill, or similar agreement" but the Proxy fails to disclose whether such agreements actually exist.

   B.     **The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

41.     The Proxy also omits material information that renders Evercore's Fairness Analysis materially misleading.

42.   The Proxy describes the Fairness Opinion and the various valuation analyses that Evercore performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.   Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.   Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.   The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.   Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

43.   With respect to both the Management Case and Historical Growth Capital Expenditure Case Management Projections, the Proxy fails to provide (i) Unlevered after-tax free cash flow projections, and further fails to provide all of the financial projections provided by management with regard to the fairness analyses for the following items: (ii) Revenue, (iii) Operating expenses, (iv) Interest, (v) Taxes (or tax rate), (vi) Depreciation and amortization, and (vii) Changes in working capital, and (viii) Any other line items used in the calculation of unlevered free cash flow. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

44.   Moreover, the Proxy falsely represents that the Historical Growth Capital Expenditure Case projections "represented a more reasonable current assumption with respect to annual growth capital expenditures than is included in the TGE Financial Projections," Proxy, C-1, even though the timeline in the Proxy suggests that the Historical Growth Capital Expenditure Case

projections were prepared primarily if not solely to justify an inadequate merger price.

45.     Further, the Proxy fails to disclose all of the financial projections that were prepared for and analyzed by the Board.  For example, although the Proxy only discloses the financial projections under the Management Case and Historical Growth Capital Expenditure Case, the Proxy also states that the Board discussed "analyses with respect to financial cases that were adjusted from the Management Case to reflect *ranges of sensitivities or other adjustments*, including the Historical Growth Capital Expenditure Case."

46.     With respect to Evercore's *Discounted Cash Flow Analysis*, ("DCF") beginning on Page 43 and the *Sum of the Parts—Discounted Cash Flow Analysis* beginning on Page 45, the Proxy fails to: (i) disclose the projected free cash flow amounts, (ii) fully disclose Evercore's rationale and basis for selecting its various discount rate ranges, (ii) fully disclose Evercore's rationale and basis for applying its various ranges of EBITDA exit multiples, (iii) fully disclose Evercore's rationale and basis for applying its various ranges of perpetuity growth rates, and (vi) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates, perpetuity growth rates, and EBITDA exit multiples for each analysis.

47.     With respect to Evercore's *Discounted Dividend Analysis*, beginning on Page 44, the Proxy fails to: (i) fully disclose Evercore's rationale and basis for selecting a cost of equity range of 7.5% to 8.5% based on CAPM and 11.0% to 13.0% based on total expected market return even though Evercore's *Discounted Cash Flow* analysis applied a discount rate range of 6.5% to 7.5%, (ii) fully disclose Evercore's rationale and basis for adding a terminal value to the Historical Growth Capital Expenditure Case by utilizing a terminal yield range of 12.0%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates, perpetuity growth rates, and EBITDA exit multiples.

48.     This information is material to the Company's shareholders, and the omission of this

information renders the summary of the *Discounted Cash Flow Analysis* and *Discounted Dividend Analysis* incomplete and misleading.   As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis* and *Discounted Dividend Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

49.   With respect to Evercore's *Corporate Level-Peer Group Trading Analysis* beginning on Page 44 and *Sum of the Parts—Peer Group Trading Analysis* beginning on Page 52, the Proxy fails to disclose (i) all of the objective criteria that Evercore relied on in selecting the purportedly comparable companies, (ii) the individual trading multiples for the selected companies, and (iii) the enterprise valuations of each selected company.  Indeed, with only 10 companies included in the

analysis, the omission of any data with respect to the range or variance is unquestionably material to shareholders trying to decide how much weight, if any, to place on the analysis. *E.g., See, e.g., Rosenblatt v. Getty Oil Co.*, Case No. 5278, 1983 Del. Ch. LEXIS 570, at \*71-72 (Del. Ch. Sept. 19, 1983) (rejecting analysis that used "smaller oil and gas producing companies as opposed to a major integrated company such as [the appraised company]"), *aff'd*, 493 A.2d 929 (Del. 1985); *see also, In re PNB Hldg. Co. S'holder Litig.*, Cons. C.A. No. 28-N, 2006 Del. Ch. LEXIS 158, at \*96 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable companies analysis where the "comparable publicly-traded companies all were significantly larger than [the subject company], with one having total assets of $587 million as compared to [the subject company's] assets of $216 million.").

50.     With respect to Evercore's *Sum of the Parts—Precedent M&A Transaction Analysis* beginning on Page 48, the Proxy fails to disclose (i) all of the objective criteria that Evercore relied on in selecting the purportedly comparable transaction, (ii) the purchase price for the companies being acquired in each transaction, and (ii) the individual EBITDA multiples implied in each transaction.

51.     If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

52.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

53.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

55.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

56.    The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

58.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

59.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially

incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

60.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

61.    The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

62.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

67.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

//

//

//

//

//

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: February 3, 2020

**MONTEVERDE & ASSOCIATES PC**

By:  _/s/ Juan E. Monteverde_
      Juan E. Monteverde (JM-8169)
      The Empire State Building
      350 Fifth Avenue, Suite 4405
      New York, NY 10118

**OF COUNSEL:**
      Tel:(212) 971-1341
**ADEMI & O'REILLY, LLP**
      Fax:(212) 202-7880
Guri Ademi
      Email: jmonteverde@monteverdelaw.com
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
      *Attorneys for Plaintiff*
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
      jfruchter@ademilaw.com


*Attorneys for Plaintiff*